UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
ALEXANDRIA DIVISION

ROBERT TRENT HOLLINGSWORTH,      CIVIL ACTION NO. 16-675
JONATHAN CADE PILCHER, JERRY
TRAYLOR, AND LOUISIANA           JUDGE
SPORTSMEN ALLIANCE, LLC
                                 MAGISTRATE JUDGE
VERSUS

UNITED STATES DEPARTMENT OF
AGRICULTURE,  UNITED STATES
FOREST SERVICE, TOM VILSACK,
THOMAS TIDWELL, AND TONY
TOOKE

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

**NOW INTO COURT**, through undersigned counsel, comes Robert Trent Hollingsworth,

Jonathan Cade Pilcher, Jerry Traylor, and Louisiana Sportsmen Alliance, LLC (collectively,

"Plaintiffs") to file this Complaint for Declaratory and Injunctive Relief against Defendants

United States Department of Agriculture,  United States Forest Service, Tom Vilsack, Thomas

Tidwell, and Tony Tooke, and in support of their claims allege as follows:

### PARTIES

1.    Plaintiff Robert Trent Hollingsworth is a citizen of Louisiana and resides in Dry Prong,

      Louisiana.

2.    Plaintiff Jonathan Cade Pilcher is a citizen of Louisiana and resides in Many, Louisiana.

3.    Plaintiff Jerry Traylor is a citizen of Louisiana and resides in Pollock, Louisiana.

4.    Plaintiff Louisiana Sportsmen Alliance, LLC ("LSA") is a Louisiana LLC with its

      registered office in Dry Prong, Louisiana.  The LSA brings this action on behalf of itself

1

and all of its individual members.  Plaintiffs Hollingsworth, Pilcher, and Traylor are all members of the LSA.

5.    Defendant United States Department of Agriculture is an agency of the United States.

6.    Defendant United States Forest Service is an agency of the United States Department of Agriculture.

7.    Defendant Tom Vilsack is named in his official capacity as Secretary of the United States Department of Agriculture.

8.    Defendant Thomas Tidwell is named in his official capacity as Chief of the United States Forest Service.

9.    Tony Tooke is named in his official capacity as the Region 8 Forester of the United States Forest Service.

## JURISDICTION

10.    Jurisdiction in this Court is proper pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1346, and 28 U.S.C. § 1361.

11.    This Court is authorized to award the requested declaratory and injunctive relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202, the Administrative Procedure Act, 5 U.S.C. §§ 701-706, and 28 U.S.C. § 1361.

12.    Plaintiffs herein have exhausted their administrative remedies but have received an adverse decision from the United States Forest Service, an agency of the United States Department of Agriculture.

## VENUE

13.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims stated herein occurred in this District. Venue is also proper in this District pursuant to 28 U.S.C. § 1391(e) because the

2

defendants include officers or employees of the United States or agencies thereof and a substantial part of the events or omissions giving rise to the claims stated herein occurred in this District.

## NATURE OF ACTION

14.     This is an action for declaratory and injunctive relief with regard to the arbitrary and capricious decision of the United States Forest Service to eliminate the hunting of deer with dogs ("Dog-Deer Hunting") in the Kisatchie National Forest ("the Forest") in Louisiana.  For several hundred years, since at least colonial times, Louisiana hunters have used dogs to hunt deer.  This tradition has been passed down through families for generations and is a vital part of the familial, social, and cultural fabric of Louisiana. Dog-Deer Hunting has been permitted in the Forest, to the extent consistent with Louisiana law, since the Forest's inception.  Beginning in at least 2008, the then-United States Forest Service's Region 8 Forester, Elizabeth Agpaoa, sought to eliminate this rich tradition from the Forest.[1]  After two attempts to ban Dog-Deer Hunting in the Forest, and two reversals on administrative appeal, Ms. Agpaoa finally achieved her goal. However, the Forest Service's result-driven decision to ban Dog-Deer Hunting within the Forest is arbitrary, capricious, and contrary to the internal regulations of the Department of Agriculture and the Forest Service, the Administrative Procedure Act, and the National Environmental Policy Act.  Accordingly, Plaintiffs are entitled to declaratory and injunctive relief preventing the Forest Service from enforcing its decision.

---

[1] Ms. Agpaoa has recently been replaced as the regional forester by Tony Tooke.

PD.18953306.1

## FACTUAL BACKGROUND

### The Plaintiffs

### Robert Trent Hollingsworth

15.    Robert Trent Hollingsworth is a lifelong resident of Louisiana.  He is a current resident of Dry Prong, Louisiana, and his property borders the Forest.  He has lived within 30 minutes of the Forest for his entire life.

16.    Mr. Hollingsworth, who is 37 years old, has been an avid hunter since the age of two.  He first went hunting in the Forest at the age of ten with his father.

17.    Mr. Hollingsworth has enjoyed the practice of Dog-Deer Hunting since the age of ten and has been hunting deer in the Forest legally, both with and without dogs, for 28 years.

18.    Mr. Hollingsworth has lovingly raised his own hunting dogs for many years.  He currently owns 21 hunting dogs, which range in age from two months to nine years.

19.    The two youngest dogs, Cloud and Sunshine, are eight weeks old and belong to his two daughters, who named them.

20.    Over the last five years, Mr. Hollingsworth has spent nearly $40,000 caring for his hunting dogs.

21.    The tradition of Dog-Deer Hunting has been passed down through Mr. Hollingsworth's family for five generations.

22.    Most recently, Mr. Hollingsworth has begun passing the tradition on to his two daughters, aged 8 and 4.

23.    Mr. Hollingsworth's daughters have joined him on dog-deer hunts in the Forest on many occasions.  The girls participate in the care of the hunting dogs.  Like Mr. Hollingsworth did when he was a child, his daughters learn important life lessons about responsibility and hard work by assisting him in caring for the dogs.

PD.18953306.1

24.     Mr. Hollingsworth purchased his home, in large part, because of its proximity to the Forest.  The Forest's proximity to his home made it much easier to involve his young daughters in the important family and cultural tradition of Dog-Deer Hunting.

25.     Mr. Hollingsworth and his large family have, for over 50 years, organized large family gatherings around their annual Dog-Deer Hunting trips to the Forest.

26.     Prior to the ban, Mr. Hollingsworth would regularly go Dog-Deer Hunting with his grandfather, father, uncles, cousins, and his children in the Forest.

27.     Mr. Hollingsworth has never been cited for a violation of any state, local, or federal law or regulation while Dog-Deer Hunting.

28.     Mr. Hollingsworth and his community have long embraced Dog-Deer Hunting as an important social and cultural tradition that they can trace back for generations.

29.     Mr. Hollingsworth was a founding member of the LSA and has been a member continuously since its founding.

30.     The Forest Service's decision to ban Dog-Deer Hunting has adversely impacted Mr. Hollingsworth in many ways including, but not limited to:

     (a)     He is no longer able to take his young girls into his backyard to enjoy Dog-Deer Hunting in the Forest.

     (b)     If he wishes to enjoy Dog-Deer Hunting now, he must incur substantial cost to travel to Mississippi and/or Arkansas, where the Forest Service still permits Dog-Deer Hunting in the National Forests.

     (c)     When Mr. Hollingsworth travels to other states to engage in Dog-Deer Hunting, he must incur the substantial cost of purchasing a non-resident hunting license,

PD.18953306.1

which generally costs several hundred dollars more than a Louisiana hunting license.

31.    Mr. Hollingsworth, both individually and through the LSA, actively participated in the notice and comment process and in the agency and the administrative appeals below.  Mr. Hollingsworth, both individually and through the LSA, has exhausted his administrative remedies.

**Jonathan Cade Pilcher**

32.    Jonathan Cade Pilcher is a lifelong resident of Louisiana.  He is a current resident of Many, Louisiana and lives approximately 40 miles from the Forest.  He has lived within 50 miles of the Forest for his entire life.

33.    Mr. Pilcher, who is 49 years old, has been an avid hunter since the age of five.  He first went hunting at the age of five with his father and grandfather.

34.    Mr. Pilcher has enjoyed the practice of Dog-Deer Hunting since the age of five and has been hunting deer in the Forest legally, both with and without dogs, for 21 years.

35.    Mr. Pilcher has lovingly raised his own hunting dogs for nearly 40 years.  He currently owns 21 hunting dogs, which range in age from four months to eight years.

36.    Over the last five years, Mr. Pilcher has spent over $15,000 caring for his hunting dogs.

37.    The tradition of Dog-Deer Hunting has been passed down through Mr. Pilcher's family for at least five generations since the 1800's.

38.    Mr. Pilcher has passed the tradition on to his two teenage sons, aged 16 and 19.

39.    Mr. Pilcher's sons have joined him on dog-deer hunts in the Forest on many occasions.

PD.18953306.1

40. The boys began participating in the care of the hunting dogs when they were five years old.  Like Mr. Pilcher did when he was a child, his sons learned important life lessons about responsibility and hard work by assisting him in caring for the dogs.

41. Mr. Pilcher's sons now own and care for their own hunting dogs.

42. Mr. Pilcher and his family have, for over 100 years, organized family Dog-Deer Hunting trips.

43. Mr. Pilcher and his community have long embraced Dog-Deer Hunting as an important social and cultural tradition that they can trace back for generations.

44. Mr. Pilcher has been a member of the LSA for the last five years.

45. The Forest Service's decision to ban Dog-Deer Hunting has adversely impacted Mr. Pilcher in many ways including, but not limited to:

   (a)    Despite a long family tradition of Dog-Deer Hunting in the Forest, Mr. Pilcher is no longer able to hunt in the Forest.

   (b)    Because hunting on private lands is incredibly expensive, Mr. Pilcher is no longer able to engage in the centuries-old cultural tradition of Dog-Deer Hunting.

   (c)    As a result of the Forest Service's decision, Mr. Pilcher has been stripped of his ability to engage in an important and valued family and cultural tradition.

46. Mr. Pilcher, through the LSA, actively participated in the notice and comment process and in the agency and the administrative appeals below.  Mr. Pilcher, through the LSA, has exhausted his administrative remedies.

PD.18953306.1

**Jerry Traylor**

47.   Jerry Traylor is a lifelong resident of Louisiana.  He is a current resident of Pollock, Louisiana, and his property borders the Forest.  He has lived within 30 minutes of the Forest for the majority of his life.

48.   Mr. Traylor, who is 78 years old, has been an avid hunter since the age of eight.  He first went hunting in the Forest in 1958, and hunted in the Forest every year until the Forest Service banned Dog-Deer Hunting.

49.   Mr. Traylor has enjoyed the practice of Dog-Deer Hunting since the age of ten and has been hunting deer in the Forest legally, both with and without dogs, for over 50 years.

50.   Mr. Traylor has lovingly raised his own hunting dogs for many years.  He currently owns 7 hunting dogs, which range in age from one to ten years.

51.   Over the last five years, Mr. Traylor has spent over $15,000 caring for his hunting dogs.

52.   The tradition of Dog-Deer Hunting has been passed down through Mr. Traylor's family for over 150 years and five generations.

53.   Mr. Traylor has been Dog-Deer Hunting with his father, grandfather, and uncles.  He has passed the tradition on to his five sons and several grandchildren.

54.   Mr. Traylor's five sons all raise their own hunting dogs and participate in the family tradition of Dog-Deer Hunting.

55.   Mr. Traylor's current residence borders the Forest.  The Forest's proximity to his home made it much easier to involve his family in the important family and cultural tradition of Dog-Deer Hunting.  Moreover, given Mr. Traylor's age, his physical proximity to the Forest made it easier for him to engage in the valued family tradition of Dog-Deer Hunting.

56.    Prior to the ban, Mr. Traylor would regularly go hunting with dogs with his grandfather, father, uncles, children, and grandchildren in the Forest.

57.    Mr. Traylor has never been cited for a violation of any state, local, or federal law or regulation while Dog-Deer Hunting.

58.    Mr. Traylor and his community have long embraced Dog-Deer Hunting as an important social and cultural tradition that they can trace back for generations.

59.    Mr. Traylor has been a member of the LSA since 2009.

60.    The Forest Service's decision to ban Dog-Deer Hunting has adversely impacted Mr. Traylor in many ways including, but not limited to:

    (a)    He is no longer able to take his family into his backyard to enjoy Dog-Deer Hunting in the Forest.

    (b)    Because of his advanced age and fixed retirement income, Mr. Traylor has been forced to stop hunting altogether as a result of the Forest Service's decision to ban Dog-Deer Hunting in the Forest.

    (c)    Mr. Traylor's income prevents him from paying for a relatively expensive private lease that would enable him to engage in Dog-Deer Hunting on private land.

    (d)    Mr. Traylor's income and age prevent him from spending the substantial resources necessary to travel to other states to engage in Dog-Deer Hunting on public land.

    (e)    The Forest Service's arbitrary decision to ban Dog-Deer Hunting in the Forest has effectively destroyed Mr. Traylor's ability to engage in a 150-year-old family and cultural tradition.

PD.18953306.1

61.     Mr. Traylor, through the LSA, actively participated in the notice and comment process and in the agency and the administrative appeals below.  Mr. Traylor, through the LSA, has exhausted his administrative remedies.

## Louisiana Sportsmen Alliance

62.     The Louisiana Sportsmen Alliance is an organization of Louisiana sportsmen with a common goal of preserving the traditions and rights of the Louisiana sportsman. Louisiana has been known as the "Sportsman's Paradise" for many years.  LSA values that distinction and is dedicated to defending it.   The LSA's purposes include the preservation of hunting lands for its members.

63.     The LSA actively participated in the notice and comment process and in the agency and the administrative appeals below.  The LSA has exhausted its administrative remedies.

64.     Multiple individual members of the LSA have been directly injured by the Forest Service's decision in this matter, including the individual Plaintiffs in this suit.

## Dog-Deer Hunting in the Forest

65.     The Kisatchie National Forest is Louisiana's only National Forest and covers over 600,000 acres of non-contiguous land in northern and central Louisiana.

66.     The Forest is managed by the United States Forest Service, which is an agency of the United States Department of Agriculture.

67.     The Forest Service's management of the Forest is governed by the 1999 "Revised Land and Resource Management Plan" (the "Forest Plan").

68.     Since its inception, the National Forest has permitted Dog-Deer Hunting in accordance with Louisiana law as regulated by the Louisiana Department of Wildlife and Fisheries ("LDWF").

PD.18953306.1

69.     The LDWF permits Dog-Deer Hunting during designated seasons by all hunters with a valid permit.  A special permit for Dog-Deer Hunting is not required in Louisiana.

70.     For several decades, the Forest cooperated with the LDWF in establishing Dog-Deer Hunting seasons in the Forest.

### The Forest Service's First Attempt to Ban Dog-Deer Hunting

71.     In 2009, the Forest Service, in response to complaints from a very small group of individuals, decided to ban Dog-Deer Hunting in the Forest.  This decision was made privately without any of the procedural safeguards required by law.

72.     After deciding to ban Dog-Deer Hunting in the Forest, the Forest Service issued a proposal to amend the Forest Plan to ban Dog-Deer Hunting.  This proposal initiated the formal rulemaking process and sought public comment.  Nonetheless, the Forest Service had already made its decision.

73.     The Forest Service received 1,237 comments in response to their notice, 917 of which objected to the proposed ban.

74.     Many of the public comments argued that the elimination of Dog-Deer Hunting from the Forest would cause substantial injury to a vital part of the social fabric of the State.

75.     As required by the National Environmental Policy Act, 42 U.S.C. § 4321, *et seq* ("NEPA") and its implementing regulations, 40 C.F.R. § 1500.1, *et seq.*, the Forest Service prepared an Environmental Assessment regarding the proposed change to the Forest Plan in April of 2010.

76.     NEPA requires agencies to "assure for all Americans safe, healthful, productive, and aesthetically and culturally pleasing surroundings" and "attain the widest range of beneficial uses of the environment without degradation, risk to health or safety, or other undesirable and unintended consequences."  42 U.S.C. § 4331(b).

77.     The  Environmental Assessment identified three potential actions that the Forest Service
        could take: (1) take no action and continue to permit Dog-Deer Hunting in the Forest; (2)
        implement the proposed amendment to the Forest Plan and ban Dog-Deer Hunting from
        the Forest; or (3) designate specific areas for Dog-Deer Hunting.

78.     While the Environmental Assessment identified three options, the Forest Service was
        determined to ban Dog-Deer Hunting in the Forest; thus, the entire administrative
        process, designed to engage the public in the decision process, was futile.

79.     In December of 2010, the Forest Service, acting through Ms. Agpaoa,  issued a Decision
        Notice formally selecting alternative 2—the complete ban.

80.     The  negative  public  response  to  the  Forest  Service's  decision  was  swift  and
        overwhelming.  Over 1,000 administrative appeals were filed and, in July of 2011, a
        Forest Service Reviewing Officer reversed the decision.

81.     The  Reviewing Officer found that the Forest Service's decision failed to engage in a
        meaningful analysis of the alternative proposals, failed to address the significance of the
        ban  in  several  important  contexts,  including  its  effect  on  the  social  fabric  of  the
        community, and failed to demonstrate any meaningful connection between the alleged
        data and her conclusion.

82.     One  particularly  glaring  deficiency  in  Ms.  Agpaoa's  first  attempt  to  ban  Dog-Deer
        Hunting was her conclusory analysis of the "data" purportedly underlying her decision.

83.     In support of her decision, Ms. Agpaoa cited data that she claimed demonstrated that
        Dog-Deer Hunters are much more likely to violate Forest Service regulations.

84.     In reality, as noted by the Reviewing Officer, the "data" relied on by Ms. Agpaoa was
        largely non-scientific (much of it came from a single personal interview), the "data"

failed to differentiate between citations issued to Dog-Deer Hunters, conventional hunters, and/or the general public, and the "data" failed to account for numerous possible alternative explanations for the increase in citations during Dog-Deer Hunting season.

85.   As a result of the many deficiencies in Ms. Agpaoa's result-driven attempt to ban Dog-Deer Hunting in the Forest, the Reviewing Officer reversed the ban.

### The Forest Service's Second Attempt to Ban Dog-Deer Hunting

86.   Not to be deterred from her quest to ban Dog-Deer Hunting in the Forest, Ms. Agpaoa immediately embarked on a second attempt to enact the ban.

87.   After issuing public notice of her second attempt to ban Dog-Deer Hunting in the Forest, the matter opened for public comment.

88.   The Forest Service received over 1,300 comments, less than 1% of which supported the proposed ban.

89.   Despite the fact that over 99% of public comments received opposed the ban, Ms. Agpaoa remained determined to complete the process of enacting the ban.

90.   To that end, a new Environmental Assessment was prepared in February of 2012, identifying the same three options as the first Environmental Assessment.

91.   Later that same month, Ms. Agpaoa formally decided to ban Dog-Deer Hunting in the Forest.

92.   Once again, over 1,000 administrative appeals were filed challenging the ban.

93.   As with Ms. Agpaoa's first decision, the Reviewing Officer found pervasive flaws in her decision to ban Dog-Deer Hunting in the Forest.

94.   The Reviewing Officer remanded the matter to Ms. Agpaoa and ordered her to comply with certain remedial instructions before enacting the ban.

PD.18953306.1

95.     Specifically, the Reviewing Officer held that: (1) the decision did not demonstrate that Ms. Agpaoa appropriately considered the totality of the facts in reaching her decision; (2) the record did not support Ms. Agpaoa's conclusion that Dog-Deer Hunters are responsible for a disproportionate number of legal violations; and (3) that Ms. Agpaoa used multiple, inconsistent sets of data to support her conclusions.

96.     Despite the Reviewing Officer's clear instruction that the "data" underlying Ms. Agpaoa's decision was flawed and did not support her conclusions, she made no attempt to collect new data or to engage in a meaningful analysis of the data she collected.

97.     Instead, Ms. Agpaoa merely issued a conclusory "errata" notice.

98.     The "errata" notice made no effort to achieve substantive compliance with the Reviewing Officer's instructions.

99.     Indeed, to the Forest Service has made no effort to generate or analyze any data supporting its conclusion that Dog-Deer Hunters generally fail to comply with applicable regulations.

100.    This failure is significant and ultimately fatal to the decision because the conclusions regarding Dog-Deer Hunters' compliance with regulations are the sole "evidence" supporting the decision.

101.    Nonetheless, despite its failure to comply with the Reviewing Officer's instructions, the Forest Service has enacted the ban.

**Dog-Deer Hunting in Other National Forests**

102.    Dog-Deer Hunting is generally legal in nine of the thirteen states located in Forest Service Region 8.

103.    Dog-Deer Hunting is permitted in the National Forests in at least half of those states.

14

104.   Despite the fact that Dog-Deer Hunting is permitted in many of the National Forests that she oversaw, Ms. Agpaoa singled out Louisiana's only National Forest in which to ban Dog-Deer Hunting.

105.   The Forest Service has not presented any reason whatsoever why Dog-Deer Hunting in Louisiana is different from Dog-Deer Hunting in the other states in Region 8.

**The Forest Service's Decision to Ban Dog-Deer Hunting is Arbitrary and Capricious**

106.   5 U.S.C. § 706(2)(A) provides that agency actions must be set aside if they are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law.

107.   The Forest Service's Decision to ban Dog-Deer Hunting is arbitrary and capricious in several respects including, but not limited to:

(a)   The decision bans Dog-Deer Hunting but allows the hunting of other game using dogs to continue.  This is arbitrary because the decision makes no effort to differentiate between Dog-Deer Hunting and other types of hunting with dogs.  In the absence of evidence supporting a conclusion that Dog-Deer Hunting is somehow different from other types of hunting with dogs, the decision to ban Dog-Deer Hunting only is arbitrary.

(b)   The decision bans Dog-Deer Hunting in the Kisatchie National Forest only, while allowing Dog-Deer Hunting in other National Forests of Region 8 to continue.  In the absence of evidence supporting a conclusion that Dog-Deer Hunting in the Kisatchie National Forest is somehow different from Dog-Deer Hunting in other National Forests, the decision to ban Dog-Deer Hunting in only the Kisatchie National Forest is arbitrary.

(c)   The decision to ban Dog-Deer Hunting in the Kisatchie National Forest is wholly unsupported by any reliable, verifiable data or analysis.

108.   The Forest Service's decision also fails to consider several important aspects of the problem.  Most importantly, the Forest Service gave no consideration to the effect that a ban on Dog-Deer Hunting would have on the culture of western Louisiana that has embraced Dog-Deer Hunting for hundreds of years.  The Forest Service also failed to properly consider the economic impact that the proposed ban would have on the hunters themselves.

109.   The Forest Service's decision is based primarily on Ms. Agpaoa's contention that Dog-Deer Hunters generally disregard the law and create conflict with landowners adjacent to the Forest.

110.   This explanation, however, runs counter to the evidence before the agency.  While Ms. Agpaoa makes much of the alleged violations committed by Dog-Deer Hunters, the record before the agency is devoid of any evidence demonstrating that Dog-Deer Hunters—as opposed to other individuals—committed any violations.

111.   The record is similarly devoid of any evidence that Dog-Deer Hunters created conflict with adjacent landowners.

**The Forest Service's Decision to Ban Dog-Deer Hunting is Contrary to the Reviewing Officer's Decision**

112.   The Reviewing Officer's decision regarding the Forest Service's second attempt to ban Dog-Deer Hunting in the Forest ordered the Forest Service to:

(a)   correct its decision to include evidence that its findings were considered in appropriate context;

(b)   correct the decision to comply with 40 C.F.R. § 1502.24 by demonstrating which violations are directly attributable to Dog-Deer Hunters;

(c)     correct its analysis to include information demonstrating that it estimated the number of Dog-Deer Hunters in the Forest with scientific accuracy;

(d)     correct the decision to include some evidence supporting its conclusion that modern technology increases conflicts between Dog-Deer Hunters and other users of the Forest, or remove that conclusion altogether.

113.    On remand, Ms. Agpaoa issued an "errata" sheet that failed to address any of the deficiencies identified by the Reviewing Officer.  This failure renders her decision arbitrary, capricious, and not in accordance with the law.

114.    The Reviewing Officer's subsequent approval of the errata sheet was also arbitrary, capricious, and not in accordance with the law because the errata sheet failed to address any of the deficiencies originally identified by the Reviewing Officer.

**The Forest Service's Conclusion that Dog-Deer Hunters Present a Threat to Public Safety is Not Supported by Substantial Evidence**

115.    From the beginning of her quest to ban Dog-Deer Hunting in the Forest, Ms. Agpaoa's purported main concern has been "public safety."

116.    To support the questionable conclusion that Dog-Deer Hunters present public safety issues so severe that the practice must be banned from the Forest, the Forest Service relied primarily on "data" regarding the number of citations issued in the Forest during Dog-Deer season.

117.    40 C.F.R. § 1502.24 requires agencies to insure the scientific integrity of the analysis in decisions governed by NEPA.

118.    The Forest Service's analysis is devoid of any scientific integrity.

119.    In reality, none of the "data" collected by the Forest Service supports its conclusions regarding the data.

17

120.   The "data" regarding citations issued in the Forest is completely disconnected from any information regarding the length of the season.  In 2007, when the Dog-Deer Hunting season in the Forest was 7 days long, the Forest Service included citation data spanning 29 days.  No reason for this discrepancy is contained in the administrative record.

121.   The "data" relied upon by the Forest Service does not show which, if any, violations are directly attributable to Dog-Deer Hunters or even how many Dog-Deer Hunters used the Forest in any relevant year.  Accordingly, there is simply no way to know whether Dog-Deer Hunters are responsible for a higher proportion of violations than other hunters.

122.   For example, from 2006 to 2010, a total of 493 citations were reportedly issued by the United States Forest Service Law Enforcement and Investigations' Officers and Agents. The Forest Service concluded that of those 493 citations, 185 were issued during the Dog-Deer Hunting seasons for that same time period.  Even though the Forest Service had no data to directly tie the number of citations issued during Dog-Deer season to Dog-Deer hunters, the Forest Service concluded that "a disproportionate number of [citations] are issued to *deer hunters* during the Dog-Deer season."  This conclusion, like most of the conclusions reached by the Forest Service, is wholly unsupported by any evidence.

123.   Even a quick review of the "data" relied upon by the Forest Service demonstrates that the Forest Service's "analysis" failed to take into account several important factors:

(a)    First, of the 184 "violations" identified during the Dog-Deer Hunting seasons from 2006 to 2010, 52 were warning notices, 76 were "incident reports," 4 were "mandatory appearances," and 52 were "collateral."  The Forest Service makes no attempt to explain or consider the difference in the nature of the "violations" and

does not analyze or explain the difference between and/or import of the various classifications.

(b)     Second, of the 184 "violations," 158 of them were for violations of 36 C.F.R. § 261.8(a), which prohibits the "[h]unting, trapping, fishing, catching, molesting, killing or having in [one's] possession any kind of wild animal, bird, or fish, or taking the eggs of any such bird" to the extent federal or state law is violated.  The Forest Service fails to disclose that approximately 86% percent of the violations that occurred during Dog-Deer Hunting seasons from 2006 through 2010 were based on this federal regulation.  This is hardly the kind of serious public safety issue that the Forest Service attempts to portray it as in its decision.

(c)     Third, in light of the relatively short Dog-Deer Hunting season, logic would counsel that the Forest experiences an increase in forest users during the Dog-Deer season, when the approximately 660 to 983 Dog-Deer Hunters utilize the Forest.  With an increase of forest users, it is likewise safe to assume that more forest users will result in more citations being issued.  By failing to calculate the number of other users of the Forest during the deer-hunting season, it is impossible to know if the increase in citations during Dog-Deer Hunting season is merely a result of the increased population and/or activity or whether a conclusion can be drawn that individuals who engage in Dog-Deer Hunting are more inclined to commit violations that lead to citations.   In fact, this data might well lead to the conclusion that the best solution to the perceived public safety issue would be a *longer* Dog-Deer Hunting season, thus allowing the estimated 660 to 983 Dog-Deer Hunters sufficient time to stagger their hunting trips.

19

(d)     Fourth, the Forest Service also included data regarding citations and warnings issued by the LDWF during the Dog-Deer Hunting seasons from 2007 through 2010.  In that time period, according to the Forest Service, the LDWF issued a total of 154 citations and warnings during the Dog-Deer Hunting seasons from 2007 through 2010, 66 of which the Forest Service classified as "safety related." The Forest Service, however, failed to analyze any LDWF data regarding citations issued outside of Dog-Deer Hunting seasons.  Without any comparative data, the Forest Service's inclusion of the LDWF data is worthless and can only be viewed as an attempt to provide skewed "data" to support its desired conclusion.

124.   The Forest Service's reliance on the "data" does not comport with NEPA's implementing regulations, which require that agencies use scientific integrity in their analysis.

125.   The "data" cited by the Forest Service provides absolutely no support for its conclusion.

126.   In fact, there is no evidence in the record of a single Dog-Deer Hunter receiving a citation.

127.   The complete absence of credible evidence supporting the conclusion that Dog-Deer Hunters present a threat to public safety renders the Forest Service's decision arbitrary and capricious.

**The Forest Service's Finding of No Significant Impact was Invalid**

128.   Under the National Environmental Policy Act, an agency must issue an Environmental Impact Statement ("EIS") before undertaking any action that "significantly affects the quality of the human environment."  An agency can avoid the completion of an EIS only if the proposed action will have no significant impact on the human environment.

20

129. A finding of no significant impact ("FONSI") can be accomplished in an Environmental Assessment, a much less comprehensive document.

130. The Forest Service's decision contained a FONSI with regard to the ban on Dog-Deer Hunting in the Forest.

131. The FONSI is invalid because the agency failed to accurately identify several relevant impacts on the human environment including, but not limited to, the destruction of a centuries-old cultural tradition.

132. The FONSI also is invalid because the agency failed to take a "hard look" at the problem. Indeed, the agency's result-oriented analysis failed to engage in any meaningful analysis of the issue.

133. The FONSI is further invalid because the agency failed to make a convincing case for its finding. As detailed in this Complaint, the agency's ultimate finding was incorrect, wholly unsupported by the evidence, and purely result-oriented.

134. In this case, the Forest Service utilized data purportedly demonstrating that Dog-Deer Hunters are less law-abiding than other hunters. That data, however, suffers from a host of flaws—the largest of which are that it is internally contradictory, incomplete, and contains no information that actually connects any violation to a Dog-Deer Hunter. In light of these flaws, the Forest Service' FONSI does not pass statutory muster.

**COUNT 1 – VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT**

135. Plaintiffs hereby incorporate and re-allege paragraphs 1 through 134 as if copied i*n extenso*.

136. Pursuant to 5 U.S.C. § 706(2), Plaintiffs are entitled to have the Forest Service's ban on Dog-Deer Hunting held unlawful and set aside.

21

137. As described herein, the Forest Service's decision to ban Dog-Deer Hunting in the Forest was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

138. As further described herein, the Forest Service's decision to ban Dog-Deer Hunting in the Forest was unsupported by substantial evidence in violation of 5 U.S.C. § 706(2)(E).

139. As further described herein, the Forest Service's decision to ban Dog-Deer Hunting through the use of an Environmental Assessment, as opposed to an EIS, violated NEPA.

140. As further described herein, the Forest Service's decision to ban Dog-Deer Hunting did not comply with the applicable regulations.

141. The Forest Service's FONSI was arbitrary, capricious, an abuse of discretion, and/or otherwise not in accordance with law.

142. For any and all of the foregoing reasons, Plaintiffs are entitled to have this Court reverse the Forest Service's decision to ban Dog-Deer Hunting in the Forest.

## COUNT 2 – REQUEST FOR DECLARATORY JUDGMENT

143. Plaintiffs hereby incorporate and re-allege paragraphs 1 through 142 as if copied i*n extenso*.

144. Plaintiffs seek relief under Rule 57 of the Federal Rules of Civil Procedure and 28 U.S.C. § 2201 in the form of a judgment declaring the rights and obligations of Plaintiffs and Defendants.

145. An actual, present, and justiciable dispute exists between Plaintiffs and Defendants with respect to whether or not the Forest Service's ban on Dog-Deer Hunting was validly enacted and/or is enforceable under federal law.

PD.18953306.1

146.    Accordingly, Plaintiffs seek a declaration that (i) the Forest Service's adoption of the ban was procedurally and substantively invalid, and (ii) that the ban is invalid and unenforceable.

## COUNT 3 – REQUEST FOR PERMANENT INJUNCTION

147.    Plaintiffs hereby incorporate and re-allege paragraphs 1 through 146 as if copied *in extenso*.

148.    Plaintiffs request that the Court issue a permanent injunction, pursuant to Rule 65 of the Federal Rules of Civil Procedure, prohibiting the Forest Service from enforcing the ban on Dog-Deer Hunting in the Forest.

## FEES AND COSTS UNDER THE EQUAL JUSTICE ACT

149.    In accordance with 28 U.S.C. § 2412, Plaintiffs request that the Court award them all costs and attorneys' fees incurred in the prosecution of this action both at the agency level and before this Court.

## PRAYER

**WHEREFORE**, Plaintiffs pray that after due proceedings are had there be judgment in their favor and against Defendants, as follows:

(a)    holding that Defendants' adoption of a ban on Dog-Deer Hunting in the Forest is invalid under the Administrative Procedure Act and the Forest Service's internal regulations;

(b)    declaring that the ban on Dog-Deer Hunting in the Forest is invalid and unenforceable;

(c)    enjoining Defendants from enforcing the ban in any manner;

(d)    awarding Plaintiffs the costs and attorneys' fees they incurred in the prosecution of this action both at the agency level and before this Court; and

(e)     awarding Plaintiffs all other legal and equitable relief deemed appropriate under

the circumstances.


Respectfully submitted,

**PHELPS DUNBAR LLP**


BY:     */s/ Christopher K. Ralston*
Christopher K. Ralston, (Bar #26706)
Jeremy T. Grabill, (Bar #34924)
Arthur R. Kraatz, (Bar #35194)
Canal Place | 365 Canal Street, Suite 2000
New Orleans, Louisiana 70130-6534
Telephone: 504-566-1311
Telecopier: 504-568-9130
Email: ralstonc@phelps.com
jeremy.grabill@phelps.com
arthur.kraatz@phelps.com

**ATTORNEYS FOR PLAINTIFFS ROBERT
TRENT HOLLINGSWORTH, JONATHAN
CADE PILCHER, JERRY TRAYLOR, AND
LOUISIANA SPORTSMEN ALLIANCE, LLC**