RECEIVED

DEC 21 2018

TONY R. MOORE, CLERK
WESTERN DISTRICT OF LOUISIANA
ALEXANDRIA, LOUISIANA

**UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
ALEXANDRIA DIVISION**

| | |
|---|---|
| **ROBERT TRENT HOLLINGSWORTH, ET AL** | **ACT. NO. 1:16-cv-675** |
| **-vs-** | **JUDGE DRELL** |
| **TOM VILSACK, ET AL** | **MAG. JUDGE JOSEPH PEREZ-MONTES** |

## MEMORANDUM RULING

Before the Court is a Motion for Summary Judgment (Doc. 27) filed by the Plaintiffs, Robert Trent Hollingsworth, Jonathan Cade Pilcher, Jerry Traylor, and Louisiana Sportsmen Alliance, LLC, a Cross Motion and Response to Plaintiffs' Motion for Summary Judgment (Doc. 31) filed by the Defendants, the United States Department of Agriculture, the United States Forest Service, Tom Vilsack, Thomas Tidwell, and Tony Tooke (in their official capacities) (hereinafter collectively referred to as the "Forest Service"), a Memorandum in Opposition to the Forest Service's Motion for Summary Judgment and Reply in Support of Plaintiffs' Motion for Summary Judgment (Doc. 35) filed by Plaintiffs, and a Reply in Response to Plaintiffs' Opposition to Cross Motion for Summary Judgment (Doc. 38) filed by the Forest Service. For the following reasons, Plaintiffs' motion will be **DENIED**, the Forest Service's motion will be **GRANTED**, and the case will be **DISMISSED WITH PREJUDICE**.

1

# I.    FACTS & PROCEDURAL HISTORY

This case concerns an amendment to the Kisatchie National Forest Revised Land and Resource Management Plan ("Forest Plan") banning the age-old tradition of hunting deer with dogs ("dog-deer hunting") in the Kisatchie National Forest ("KNF"). This is the second instance in which the Court has reviewed the propriety of a dog-deer hunting ban in KNF. The prior challenge, in which Louisiana Sportsmen Alliance, LLC ("Alliance"), acted as the sole plaintiff, was ultimately dismissed for lack of jurisdiction. See Louisiana Sportsmen Alliance, L.L.C. v. Vilsack, 583 F. App'x 379 (5th Cir. 2014); Louisiana Sportsmen Alliance, LLC v. Vilsack, 984 F. Supp. 2d 600 (W.D. La. 2013).

KNF consists of over 600,000 acres stretching across seven parishes in western Louisiana.[1] The United States Forest Service, an agency of the United States Department of Agriculture, manages and protects the National Forests, including KNF.[2] The United States Forest Service is responsible for, among other things, managing the recreational resources available at KNF for the public's enjoyment and benefit. See 36 C.F.R. § 200.3(b)(2)(ii)(E).

Dog-deer hunting, which has been practiced in Louisiana since at least colonial times, is an activity in which dog-deer hunters release multiple dogs into a forest to chase and drive deer out into clearings.[3] In modern times, dog-deer hunters often drive in vehicles along the road tracking the dogs' movements, sometimes using electronic devices.[4] "Standers" are positioned to shoot the deer when driven into clearings by the dogs.[5]

---

[1] Pls.' Statement of Facts (Doc. 27-2) at ¶ 1; Defs.' Statement of Facts (Doc. 31-2) at ¶ 1.
[2] Pls.' Statement of Facts (Doc. 27-2) at ¶ 2; Defs.' Statement of Facts (Doc. 31-2) at ¶ 2.
[3] 2012 EA (G001-EA-2012-02-13.pdf) at 22, 32.
[4] Id. at 22.
[5] Id.

Historically, the Forest Service cooperated with the Louisiana Department of Wildlife and Fisheries ("LDWF") to set the dog-deer hunting season on an annual basis.[6] The dog-deer hunting season was incrementally decreased, however, from a high of twenty-eight days in the mid-1990s to a low of seven days in the 2007-2008 hunting season.[7] The Forest Service ultimately banned the practice of dog-deer hunting in 2012, though the ban did not take full effect until 2013 because of the prior challenge to the ban in this Court.[8]

The Forest Service first proposed an amendment to the Forest Plan prohibiting dog-deer hunting in August 2009.[9] Accordingly, the Forest Service solicited public comments via letters and posted notices of the proposed amendment.[10] It received 1,237 responses to its request for comments in which 320 agreed with the prohibition and 917 opposed it.[11] In 2010, the Forest Service developed an Environmental Assessment ("2010 EA"), as required by the National Environmental Policy Act ("NEPA"), that analyzed the environmental impacts of three alternatives: (1) a "no action" alternative; (2) implementation of the proposed amendment to prohibit dog-deer hunting in KNF; and (3) designation of fewer dog-deer hunting areas within KNF.[12] In December 2010, the Regional Forester issued a Decision Notice ("Decision Notice") and finding of no significant environmental impact ("FONSI") selecting the second alternative, the prohibition of dog-deer hunting in KNF.[13] On administrative appeal in July 2011, the Reviewing Officer reversed the decision to amend the Forest Plan on several grounds.[14]

---

[6] Pls.' Statement of Facts (Doc. 27-2) at ¶ 4.
[7] Defs.' Statement of Facts (Doc. 31-2) at ¶ 5.
[8] See Louisiana Sportsmen Alliance, LLC v. Vilsack, 984 F. Supp. 2d at 605.
[9] Defs.' Statement of Facts (Doc. 31-2) at ¶ 8.
[10] Id.
[11] Id. at ¶ 11.
[12] Id. at ¶¶ 9-10.
[13] Pls.' Statement of Facts (Doc. 27-2) at ¶ 10; Defs.' Statement of Facts (Doc. 31-2) at ¶ 12.
[14] Defs.' Statement of Facts (Doc. 31-2) at ¶ 13.

Following this reversal, the Forest Service issued a new proposal to amend the KNF Forest Plan in September of 2011.[15] During the second round of public comment, the Forest Service received approximately 1,279 letters, all but nineteen of which were from one form letter, and all but five of which were against the proposed prohibition.[16] Around 106 emails were also submitted, all but eleven of which were for the proposed prohibition.[17] The same three alternatives were used in developing a new Environmental Assessment ("2012 EA"), and the Forest Service again selected the second alternative.[18] The Regional Forester issued a new Decision Notice and FONSI ("2012 Decision Notice and FONSI"), which ultimately led to another administrative appeal.[19] The Reviewing Officer issued an Appeal Decision ("2012 Appeal Decision") which included five instructions that the Forest Service was required to complete before the dog-deer hunting ban outlined in the 2012 Decision Notice could be implemented.[20] In response to the 2012 Appeal Decision, the Forest Service issued an Errata document ("Errata") which was accepted by the Reviewing Officer, and the dog-deer hunting ban became final.[21]

Upon exhausting all administrative remedies, the Alliance filed a suit challenging the dog-deer hunting ban on November 16, 2012, before this Court.[22] On November 27, 2013, we issued summary judgment in favor of the Forest Service[23] and dismissed the claims with prejudice.[24] On appeal, the Forest Service argued for the first time that the Alliance lacked constitutional standing

---

[15] Id. at ¶¶ 13, 15.
[16] 2012 EA (G001-EA-2012-02-13.pdf) at 11.
[17] Id.
[18] Defs.' Statement of Facts (Doc. 31-2) at ¶ 16; 2012 EA (G001-EA-2012-02-13.pdf).
[19] Defs.' Statement of Facts (Doc. 31-2) at ¶¶ 18-19.
[20] Id. at ¶ 22.
[21] Pls.' Statement of Facts (Doc. 27-2) at ¶ 22; Defs.' Statement of Facts (Doc. 31-2) at ¶¶ 23-24.
[22] Compl., Louisiana Sportsmen Alliance, LLC v. Vilsack, 984 F. Supp. 2d 600 (W.D. La. 2013), (Doc. 1).
[23] Although the defendants named in the prior case were not exactly the same, the Court will refer to them collectively as "Forest Service" for simplicity's sake.
[24] Ruling, Louisiana Sportsmen Alliance, LLC v. Vilsack, 984 F. Supp. 2d 600 (W.D. La. 2013), (Doc. 34).

to challenge the dog-deer hunting ban.[25] The Fifth Circuit found that the Alliance did not have standing, and thus it lacked jurisdiction to consider the appeal.[26] The Fifth Circuit vacated this Court's dismissal with prejudice, and upon remand we dismissed the case without prejudice for lack of jurisdiction.[27]

Plaintiffs commenced the present suit on May 16, 2016.[28] Plaintiffs seek a reversal of the Forest Service's dog-deer hunting ban, a declaratory judgment that the ban is procedurally invalid and unenforceable, and a permanent injunction barring the Forest Service from enforcing the dog-deer hunting ban.[29] On June 30, 2017, Plaintiffs filed their motion for summary judgment,[30] and Defendants filed their cross-motion for summary judgment on July 31, 2017.[31] Oral argument was held on December 1, 2017.[32]

## II.    LAW & ANALYSIS

### A. Standing

The Supreme Court has established that "the irreducible constitutional minimum of standing contains three elements." Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992).

> First, the plaintiff must have suffered an "injury in fact"—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) "actual or imminent, not 'conjectural' or 'hypothetical.'" Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be "fairly ... trace[able] to the challenged action of the defendant, and not ... th[e] result [of] the independent action of some third party not before the court." Third, it must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision."

---

[25] See Louisiana Sportsmen Alliance, L.L.C. v. Vilsack, 583 F. App'x 379 (5th Cir. 2014).
[26] Id.
[27] J., Louisiana Sportsmen Alliance, LLC v. Vilsack, 984 F. Supp. 2d 600 (W.D. La. 2013), (Doc. 39).
[28] Compl. (Doc. 1).
[29] Id. at ¶¶ 135-48.
[30] Mot. for Summ. J. (Doc. 27).
[31] Cross Mot. for Summ. J. (Doc. 31).
[32] Minutes (Doc. 46).

Id. at 560-61 (internal citations omitted). For an association to have constitutional standing to sue on behalf of its members, it must demonstrate that: "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." Hunt v. Washington State Apple Advert. Comm'n, 432 U.S. 333, 343 (1977). In the previous incarnation of this case, the Fifth Circuit held that the Alliance, then the sole plaintiff, lacked Article III standing because it failed to: (1) allege any specific facts showing a concrete injury to any one of its members; (2) allege any specific details regarding the nature and purpose of the organization; and (3) submit any declaration or affidavits from any individual members asserting that they suffered a specific harm caused by the dog-deer hunting ban. Louisiana Sportsmen Alliance, 583 F. App'x at 381.

As the Forest Service concedes, the addition of Alliance members Hollingsworth, Pilcher, and Traylor as plaintiffs, along with their sworn declarations, establishes constitutional standing. Hollingsworth's declaration states that the Alliance "is an organization of Louisiana sportsmen with a common goal of preserving the traditions and rights of the Louisiana sportsman [including] the preservation of hunting lands for its members."[33] It further declares that he spent nearly $40,000 over five years on his hunting dogs, that he purchased his home in large part because of its proximity to the Forest and the accessibility of dog-deer hunting, and that he now incurs substantial costs to dog-deer hunt in Mississippi and/or Arkansas.[34] The declarations of Pilcher[35]

---

[33] Ex. A, Decl. of Robert Trent Hollingsworth (Doc. 27-3) at ¶ 19.
[34] Id. at ¶¶ 8, 12, 22.
[35] See Ex. B, Decl. of Jonathan Cade Pilcher (Doc. 27-4).

and Traylor[36] assert similar injuries as a result of Forest Service's prohibition of dog-deer hunting. Thus, the Court finds that Plaintiffs have constitutional standing to bring this suit.[37]

In addition to traditional Article III standing, a plaintiff bringing a claim under NEPA "must establish that the injury he complains of (*his* aggrievement, or the adverse effect *upon him*) falls within the 'zone of interests'[38] sought to be protected by the statutory provision whose violation forms the legal basis for his complaint." Lujan, 497 U.S. at 883 (emphasis in original). "Congress's purpose in enacting NEPA was to 'declare a national policy which will encourage productive and enjoyable harmony between man and his environment; . . . promote efforts which will prevent or eliminate damage to the environment and biosphere . . . ; [and] enrich the understanding of the ecological systems and natural resources important to the Nation.'" Ecosystem Inv. Partners v. Crosby Dredging, L.L.C., 729 F. App'x 287, 294–95 (5th Cir. 2018), reh'g denied (May 22, 2018) (quoting 42 U.S.C. § 4321). Thus, purely economic injuries are insufficient to establish standing when asserting a NEPA claim. Id. (citing Nev. Land Action Ass'n v. U.S. Forest Serv., 8 F.3d 713, 716 (9th Cir. 1993) (collecting cases from the Fourth, Eighth, Ninth, and D.C. Circuits)).

The Supreme Court has explained, however, that there is "no doubt that 'recreational use and aesthetic enjoyment' are among the *sorts* of interests [NEPA was] specifically designed to protect." Lujan, 497 U.S. at 886 (emphasis in original); see also Ecosystem Inv. Partners, 729 F. App'x at 295 ("Environmental injuries include, but are not necessarily limited to, detrimental effects upon a plaintiff's 'recreational use and aesthetic enjoyment.'"). Accordingly, courts have

---

[36] See Ex. C, Decl. of Jerry Traylor (Doc. 27-5).

[37] The third element of the associational constitutional standing test is met because the administrative record forms the basis of this review, and thus no individualized proof is required. See Hunt, 432 U.S. at 344.

[38] "[P]rudential standing is a misnomer as applied to the zone-of-interests analysis, which asks whether this particular class of persons ha[s] a right to sue under this substantive statute." Lexmark Int'l, Inc. v. Static Control Components, Inc., 572 U.S. 118, 127 (2014) (internal quotation marks omitted) (citation omitted).

held that plaintiffs who participate in outdoor activities such as hunting may have standing to assert NEPA claims. See Sierra Club v. Fed. Energy Regulatory Comm'n, 827 F.3d 59, 66 (D.C. Cir. 2016) (finding Sierra Club member who fished, boated, and seasonally duck hunted had standing to sue the Federal Energy Regulatory Commission under NEPA); Sierra Club v. U.S. Army Corps of Engineers, 645 F.3d 978, 983, 988 (8th Cir. 2011) (finding hunting club that engaged in activities such as duck, deer, and turkey hunting had standing to sue the U.S. Army Corps of Engineers under NEPA).

Hollingsworth's declaration provides that he has been dog-deer hunting since he was ten years old, his daughters have joined and participated in dog-deer hunts with him in KNF on many occasions, and that he can no longer go dog-deer hunting with his daughters in KNF because of the ban. [39] Again, the declarations of Pilcher[40] and Traylor[41] assert similar injuries as a result of the dog-deer hunting ban. Plaintiffs have sufficiently asserted that their recreational use and aesthetic enjoyment of KNF have been impaired by the ban.

During oral argument, the Forest Service argued that while certain types of hunting may fall within NEPA's zone of interests, dog-deer hunting does not because it is predominantly a "personal lifestyle and tradition" and has a negative impact on the environment. Many, if not most, recreational and aesthetic uses of national forests are rooted in personal lifestyles and traditions. The Forest Service's attempt to position these two categories as mutually exclusive is unconvincing. The Forest Service's second argument, that NEPA's zone of interests does not encompass recreational activities it has deemed to have a negative impact on the environment, would inappropriately preempt challenges to agency action affecting interests recognized by the

---

[39] Ex. A, Decl. of Robert Trent Hollingsworth (Doc. 27-3), at ¶¶ 5, 11, 22.
[40] See Ex. B, Decl. of Jonathan Cade Pilcher (Doc. 27-4).
[41] See Ex. C, Decl. of Jerry Traylor (Doc. 27-5).

Supreme Court. Notably, the Forest Service does not cite to any case in which a court has adopted such a view. Accordingly, the Court finds that Plaintiffs have standing to bring this suit.

B. STANDARD OF REVIEW

1. Summary Judgment Standard

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A dispute as to a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). We consider all "evidence in the light most favorable to the party resisting the motion." Trevino v. Celanese Corp., 701 F.2d 397, 407 (5th Cir. 1983). It is important to note that the standard for a summary judgment is two-fold: (1) there is no genuine dispute as to any material fact, and (2) the movant is entitled to judgment as a matter of law.

Summary judgment is "an appropriate procedure for resolving a challenge to a federal agency's administrative decision when review is based upon the administrative record . . . even though the Court does not employ the standard of review set forth in Rule 56." Sierra Club v. Fed. Highway Admin., 715 F.Supp.2d 721, 727 (S.D. Tex. 2010) (citations omitted); see also Boquet Oyster House, Inc. v. United States, CIV.A. 09-3537, 2011 WL 5187292, at *4 (E.D. La. Oct. 31, 2011). Since the court is merely reviewing the legality of the agency's decision and is not acting as the initial factfinder, summary judgment is the appropriate means for resolving claims. Spiller v. Walker, No. A-98-CA-255-SS, 2002 WL 1609722, at *6 (W.D. Tex. July 19, 2002). Therefore, we find the summary judgment procedure to be proper in this case.

2. Administrative Procedure Act

Plaintiffs seek review of an agency determination pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. § 701, et seq. While the Court reviews this case de novo, the APA "allows a federal court to overturn an agency's ruling only if it is arbitrary, capricious, an abuse of discretion, not in accordance with law, or unsupported by substantial evidence on the record taken as a whole." Amrollah v. Napolitano, 710 F.3d 568, 571 (5th Cir. 2013) (internal quotations omitted) (citations omitted); see also 5 U.S.C. § 706(2)(A) & (E). Under this standard, there is a presumption that the agency's decision is valid, and Plaintiffs have the burden to show the agency's decision is erroneous to overcome that presumption. Buffalo Marine Servs. Inc. v. United States, 663 F.3d 750, 753 (5th Cir. 2011) (quoting Tex. Clinical Labs, Inc. v. Sebelius, 612 F.3d 771, 775 (5th Cir. 2010)).

The standard of review is highly deferential to the administrative agency's decision and, most importantly to these facts, "a court is not to substitute its judgment for that of the agency." F.C.C. v. Fox Television Stations, Inc., 556 U.S. 502, 513 (2009). The agency must analyze the pertinent information and articulate a satisfactory reasoning that shows a "rational connection between the facts found and the choice made." Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co., 463 U.S. 29, 43 (1983) (quoting Burlington Truck Lines v. United States, 371 U.S. 156, 168 (1962).) An agency's decision "need not be ideal or even, perhaps, correct so long as not 'arbitrary' or 'capricious' and so long as the agency gave at least minimal consideration to the relevant facts as contained in the record." Texas Clinical Labs, Inc., 612 F.3d at 775 (citation omitted).

The Court should "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." Fox Television Stations, Inc., 556 U.S. at 513–14 (citing Bowman

Transp., Inc. v. Arkansas–Best Freight Sys., Inc., 419 U.S. 281, 286 (1974)). This narrow, deferential standard applies whether the agency's action is a change to a previous policy or a completely new policy. Id. at 514-15. The Fifth Circuit emphasizes that "under this highly deferential standard of review, courts have the least latitude in finding grounds for reversal of an agency decision." Friends of Canyon Lake v. Brownlee, No. SA-03-CA-0993-RF, 2004 WL 2239243, at *4 (W.D. Tex. Sept. 20, 2004) (citation omitted); see also Sabine River Auth. v. U.S. Dep't of Interior, 951 F.2d 669, 678 (5th Cir. 1992).

### C. Plaintiffs' Arguments

#### 1. The Forest Service's Decision is Supported by Substantial Evidence

"Substantial evidence" is a term of art describing the limited judicial review of an agency decision. United States v. Carlo Bianchi & Co., 373 U.S. 709, 715 (1963). The Supreme Court defined the "substantial evidence" standard as follows: "This standard goes to the reasonableness of what the agency did on the basis of the evidence before it, for a decision may be supported by substantial evidence even though it could be refuted by other evidence that was not presented to the decision-making body." Id.; see also United States v. Nguyen, No. 92-1518, 1995 WL 683851, at *2 (E.D. La. Nov. 14, 1995).

In the 2012 EA, the Forest Service examined the total violations it recorded during the 2006 to 2010 deer hunting seasons.[42] The term "violations" includes incident reports, warnings, notices, and violation notices issued by the Forest Service for conduct occurring on KNF.[43] During the dog-deer hunting segments of those seasons, an average of 3.43 violations were recorded per day, in contrast to the 1.16 average daily violations that were recorded for the total deer hunting

---

[42] 2012 EA (G001-EA-2012-02-13.pdf) at 22-25.
[43] Id. at 23-24.

season.[44] Similarly, LDWF recorded an average of 3.85 citations and warnings per day during the dog-hunting seasons from December 2007 through December 2010.[45] Approximately 43% of those LDWF citations and warnings were safety-related, many of which were for offenses associated with dog-deer hunting such as "Hunting, Standing, Loitering on a Public Road" and "Hunting Deer from a Public Road."[46] Although the Forest Service's violations data showed that the total number of violations issued during a given deer hunting season fluctuated yearly, the Forest Service noted that the total violations issued during the relevant dog-deer hunting season changed correspondingly, or in other words they tracked the fluctuations of the total deer hunting season violations.[47] The 2012 EA also discussed Forest Service Investigative Reports from the 2006 to 2010 dog-deer hunting seasons, and included six illustrative examples of victim statements.[48]

The Forest Service's determination that a dog-deer hunting ban would improve public safety was based in part on inferences drawn from the Forest Service's violation data, LDWF's citations and warnings data, and the Forest Service's Investigative Reports. The Forest Service was careful to caution, however, that the total number of Forest Service violations issued during a dog-deer hunting season were not exclusively issued to dog-deer hunters, and that it lacked a method of accurately identifying the type of KNF user (dog-deer or non-dog-deer) that committed each violation because the violation notices did not as a matter of course include such information.[49] It further warned that "[a]lthough data suggests that violations were influenced by

---

[44] Id. at 24.
[45] Id. at 25-26.
[46] Id. at 25.
[47] Id. at 23-24.
[48] Id. at 26-28.
[49] Id. at 23-24. Some of the incident reports include notations that they were "related to deer dog hunting." In Plaintiffs' view, the Forest Service could have instructed Forest Service agents to make such notations on all violation notices so that there would be no uncertainty about whether the two-fold increase in violations during the dog-deer hunting seasons was caused predominantly by dog-deer hunters. Plaintiffs conclude that "it appears that the missing data is

the additional presence of dog-deer hunters in the area, [LDWF] citations and warnings that specifically differentiate dog-deer hunters from other Forest users during the KNF dog-deer season is unavailable."[50] Notwithstanding these limitations, the Forest Service concluded that as a result of a dog-deer hunting ban, "[t]raffic-related violations and confrontations with other recreationists and adjacent landowners would be expected to decrease during the time of year that dog-deer hunting typically occurs."[51]

Plaintiffs argue that the Forest Service's decision to enact the ban was based on inaccurate or incomplete data, and they specifically challenge the Forest Service's violations data.[52] They argue that most of the violations are incident reports, which are merely unconfirmed alleged reported incidents that do not identify a specific person. Plaintiffs further assert that none of the actual "citations," as opposed to incident reports, are specifically attributable to dog-deer hunters. Finally, they note that some of the violations are for issues not clearly related to deer-dog hunting, such as broken taillights or nonoperational turn signals.

These attempts to call into question the overall validity of the Forest Service's violations data are unpersuasive. The dog-deer hunting at issue in this case, which by its very nature involves the dog-deer hunters and their dogs constantly changing locations, occurred around approximately

---

*not* unavailable but rather that the Forest Service has chosen not to collect it." Mot. for Summ. J. (Doc. 27-1) at 19. While the benefit of hindsight has revealed that the collection of such data would have provided great clarity as to the driving force behind the increase in violations during dog-deer hunting seasons, the Forest Service is obviously unable to retroactively remedy this lack of information. Again, the fact that the Forest Service did not collect perfectly complete data is not "fatal," as Plaintiffs posit – only substantial evidence is required. See also 40 C.F.R. § 1502.22.
[50] 2012 EA (G001-EA-2012-02-13.pdf) at 26.
[51] Id. at 28.
[52] The cases cited by Plaintiffs in this section are inapposite to the present case. Friends of Boundary Waters Wilderness v. Bosworth, 437 F.3d 815, 824-27 (8th Cir. 2006) (finding calculation that relied in part on survey responded to by only five households and that agency acknowledged was "not statistically valid" to be arbitrary and capricious); Alabama Power Co. v. F.C.C., 773 F.2d 362, 367-69 (D.C. Cir. 1985) (finding agency used a clearly erroneous method for calculating pole attachment rates); St. James Hosp. v. Heckler, 760 F.2d 1460, 1466-67 (7th Cir. 1985) (finding agency decision concerning Medicare computations based almost exclusively on a study that was limited in nature and contained sources of bias was arbitrary and capricious).

369,000 acres in KNF.[53] It is little surprise that when Forest Service agents responded to complaints from KNF users or nearby landowners about dog-deer hunters, often times those dog-deer hunters and their dogs had already left the area. Given this backdrop, it is difficult to understand what Forest Service agents were expected to do other than document the complaints in the form of incident reports. The fact that many of these incident reports will inevitably be unconfirmed allegations that do not name specific persons may limit, but does not destroy, their probative value. The substantial amount of these incident reports, many of which contain similar complaints, further lend them credibility.

Similarly unavailing is Plaintiffs' position that the incident reports largely document allegations not related to dog-deer hunting, such as minor traffic violations. The Forest Service's analysis of violations data did not suggest that *only* dog-deer hunting violations occurred during dog-deer hunting season. The analysis indicated that when the average daily violations for the total hunting seasons is used as a baseline, then roughly twice as many daily average violations are issued during dog-deer hunting seasons. Thus, one would expect that some of the violations issued during the dog-deer hunting seasons would be "ordinary," non-dog-deer hunting violations in line with the overall hunting seasons violations baseline.

Furthermore, a significant number of the violations issued during the dog-deer hunting seasons appear to be related to dog-deer hunting. A review of the 2009 incident reports,[54] for example, reveals that many of them remark that they are related to dog-deer hunting or describe

---

[53] 2012 EA (G001-EA-2012-02-13.pdf) at 5.
[54] Plaintiffs assert that "it is also telling that the overwhelming majority of the incident reports relied upon by the Forest Service were created during the 2009 season – the first season *after* the Forest Service announced its intent to ban Dog-Deer Hunting in the KNF." Mot. for. Summ. J. (Doc. 27-1) at 20. Unless Plaintiffs are alleging that the Forest Service engaged in a conspiracy to produce fraudulent incident reports or otherwise unlawfully manipulated the violations data, which they do not appear to argue, it is of no legal consequence that these incident reports were issued after the Forest Service announced its intention to ban dog-deer hunting.

deer-dog hunting.[55] Other 2009 incident reports document complaints of behavior generally associated with dog-deer hunting, such as standing on a public road with a firearm while dogs are running or running dogs too close to residential areas or through private property.[56] Although the Forest Service's violations data and its analysis of that data was subject to limitations, which the Forest Service acknowledged, as a whole the violations data is both reliable and relevant.

An analysis of violations issued by the Forest Service over several years revealed that on average more than twice as many violations were issued daily during the relatively brief dog-deer hunting seasons compared to the general deer hunting seasons. These figures were corroborated in part by LDWF citations and warnings data. Forest Service Investigative Reports from the 2006 to 2010 dog-deer seasons further supplemented the violations data. As discussed *infra*, testimony from Forest Service agents in the Errata provided further context for the significant increase in violations issued during dog-deer hunting seasons. These convergent threads of data together constitute substantial evidence supporting the Forest Service's tempered conclusion that as a result of the ban on dog-deer hunting "[t]raffic-related violations and confrontations with other recreationists and adjacent landowners would be expected to decrease during the time of year that dog-deer hunting typically occurs."

2. The Forest Service's Decision is not Arbitrary or Capricious

As stated *supra*, there is a presumption that the agency's decision is valid, and Plaintiffs have the burden to prove the decision is arbitrary, capricious or not in accordance with the law. Generally, an agency decision is arbitrary of capricious if:

"the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or

---

[55] 2009 Supplemental Materials (FY2009Redacted.pdf) at 1-27, 33-35, 43-45, 47.
[56] Id. at 28-29, 31-32, 49-51.

is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."

Luminant Generation Co. LLC v. U.S. E.P.A., 714 F.3d 841, 850 (5th Cir. 2013) (internal quotations omitted) (citations omitted).

The Court must determine whether the agency analyzed the relevant information and expressed an adequate explanation for its decision with a "rational connection between the facts found and the choice made." Texas v. U.S. E.P.A., 690 F.3d 670, 677 (5th Cir. 2012) (citation omitted). While reviewing the agency's explanation, the Court "must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." Id. (citation omitted). As long at the agency's rationale and policy choices meet "minimal standards of rationality," then its decision is "reasonable and must be upheld." Luminant Generation Co. LLC, 714 F.3d at 850 (citing Tex. Oil & Gas Ass'n v. U.S. E.P.A., 161 F.3d 923, 934 (5th Cir. 1998)).

a. *The Dog-Deer Hunting Ban Did Not Violate the Reviewing Officer's Decision*

Plaintiffs argue that the Forest Service acted arbitrarily and capriciously by failing to address deficiencies identified by the Reviewing Officer in the 2012 EA. They focus on the Reviewing Officer's finding in the 2012 Appeal Decision that:

> I find the EA violates 40 CFR 1502.24[57] because the information in the EA and appeal record does not support the conclusions in the DN and the EA related to dog-deer hunters and violations, particularly those related to public safety. The Responsible Official follows the requirements of 40 CFR 1502.22 for unavailable information. However, in addition to stating that such information is incomplete or unavailable, the EA must also include a statement of the relevance of the incomplete or unavailable information to evaluating reasonably foreseeable significant adverse impacts on the human environment. I instruct the Responsible Official to include in the environmental analysis document information regarding

---

[57] "Agencies shall insure the professional integrity, including scientific integrity, of the discussions and analyses in environmental impact statements. They shall identify any methodologies used and shall make explicit reference by footnote to the scientific and other sources relied upon for conclusions in the statement. An agency may place discussion of methodology in an appendix." 40 C.F.R. § 1502.24

violations that were committed directly by dog-deer hunters during the dog-deer hunting season or to fully fulfill the requirements of 40 CFR 1502.22[58] and explain the relevance of the unavailable information to evaluating reasonably foreseeable significant adverse impacts on the human environment.[59]

While acknowledging that the Forest Service issued an Errata which addressed that issue and was accepted by the Reviewing Officer,[60] Plaintiffs nonetheless maintain that the Forest Service has in fact failed to comply with the Reviewing Officer's instructions. The Forest Service responds that it sufficiently complied with the instruction to explain the relevance of the unavailable data, as evidenced by the Reviewing Officer's acceptance of the Errata.

The Reviewing Officer appropriately determined that the Forest Service complied with the instruction to "explain the relevance of the unavailable information to evaluating reasonably foreseeable significant adverse impacts on the human environment."[61] The Errata included statements from Assistant Special Agent in Charge Michael Donaldson ("ASA Donaldson") and Southern Region Special Agent in Charge Steve Ruppert ("SRSA Ruppert").[62] ASA Donaldson

---

[58] "If the information relevant to reasonably foreseeable significant adverse impacts cannot be obtained because the overall costs of obtaining it are exorbitant or the means to obtain it are not known, the agency shall include within the environmental impact statement: (1) A statement that such information is incomplete or unavailable; (2) a statement of the relevance of the incomplete or unavailable information to evaluating reasonably foreseeable significant adverse impacts on the human environment; (3) a summary of existing credible scientific evidence which is relevant to evaluating the reasonably foreseeable significant adverse impacts on the human environment, and (4) the agency's evaluation of such impacts based upon theoretical approaches or research methods generally accepted in the scientific community. For the purposes of this section, "reasonably foreseeable" includes impacts which have catastrophic consequences, even if their probability of occurrence is low, provided that the analysis of the impacts is supported by credible scientific evidence, is not based on pure conjecture, and is within the rule of reason." 40 C.F.R. § 1502.22(b).
[59] 2012 Appeal Decision Attach. 1 (J008b-DD2-APPEAL-WO-Decision-Attachment 1) at 3-4.
[60] Review of Errata (K003-DD2-APPEAL-DIRECTION-WO-Letter-2012-11-05-Eratta.pdf).
[61] The Forest Service notes that the language of 40 C.F.R. § 1502.22 indicates that it only applies to Environmental Impact Statements ("EIS"), not EAs or Erratas. See Sierra Club v. Espy, 38 F.3d 792, 803 (5th Cir. 1994). Regardless, the Court will analyze whether the Forest Service complied with the Reviewing Officer's instructions.
[62] "It is the professional opinion of Assistant Special Agent in Charge Michael Donaldson that the data presented in the Environmental Assessment is reflective of violations commonly associated with the act of hunting deer aided by dogs. My review of the type of violations presented, location of documented violations and the dates / times of violations are all consistent with characteristics of dog-deer hunters and the dog-deer seasons on the Kisatchie National Forest. This writer is aware that all of the data could not be connected directly to dog deer hunters by written documentation, but the writer found the data to be consistent for the entire period. (Statement of ASA Michael Donaldson, 10/15/2012).
Forest Service Law Enforcement Senior Officers Robert Bannon and Cory Gordon, assigned to the Kisatchie NF, reported to me that during the 7 to 9 day period during which hunters are allowed to use dogs to hunt deer on the

stated that based on his professional experience "the type of violations presented, location of documented violations and the dates / times of violations are all consistent with characteristics of dog-deer hunters and the dog-deer seasons on the Kisatchie National Forest."[63] SRSA Ruppert asserted "that during the 7 to 9 day period during which hunters are allowed to use dogs to hunt deer on the Kisatchie NF, 9 out of 10 contacts with forest users made by LEI personnel are with dog-deer hunters."[64] Moreover, ASA Donaldson conveyed that he is "aware that all of the data could not be connected directly to dog deer hunters by written documentation, but the writer found the data to be consistent for the entire period."[65]

Upon review of the Errata, the Reviewing Officer concluded that "the errata comply with the instructions issued with the appeal decision."[66] The Court agrees with the Reviewing Officer that the supplemental information in the Errata satisfactorily responded to the Reviewing Officer's demand for an explanation of the relevance of the unavailable to evaluating reasonably foreseeable significant adverse impacts on the human environment. Thus, the Reviewing Officer did not act arbitrarily or capriciously in confirming the amendment banning dog-deer hunting.

---

Kisatchie NF, 9 out of 10 contacts with forest users made by LEI personnel are with dog-deer hunters. The officers stated that the few still hunters contacted during the same period were reporting violations committed by dog deer hunters or lodging complaints related to dog-deer hunters' actions. They also stated that during this period, local forest users avoid the national forest due to dog-deer hunters and the potential for conflict. Officers Bannon and Gordon reported that the number of non-dog-deer hunters encountered is less than 5 per unit during the 7 to 9 day period." (Statement of Southern Region Special Agent in Charge Steve Ruppert, 10/26/2012)." Errata (K002-DD2-APPEAL-DIRECTION-Errata-2012-11-02.pdf) at 5.

[63] Id.
[64] Id.
[65] Id.
[66] Review of Errata (K003-DD2-APPEAL-DIRECTION-WO-Letter-2012-11-05-Eratta.pdf).

b. *The Forest Service Appropriately Differentiated Between Dog-Deer Hunting and Other Types of Hunting, and Between Dog-Deer Hunting in KSF Compared to Other National Forests*

Next, Plaintiffs contend that the Forest Service's dog-deer hunting ban is inconsistent with its allowance of dog hunting, including dog-deer hunting, in other contexts. In support of this argument, they cite a case in which the United States Court of Appeals for the District of Colombia remanded a rule issued by the Pipeline and Hazardous Materials Safety Administration ("Safety Administration") that banned the storage of flammable-gas fuel cell cartridges in the checked baggage of airline passengers and crew but allowed medicinal and toilet articles containing flammable gas to be so stored. Lilliputian Sys. Inc. v. Pipeline and Hazardous Materials Safety Admin., 741 F.3d 1309 (D.C. Cir. 2014). In determining that the Safety Administration needed to provide further explanation, the D.C. Circuit explained that "[a]s a general matter, an agency cannot treat similarly situated entities differently unless it 'support[s] th[e] disparate treatment with a reasoned explanation and substantial evidence in the record.'" Id. at 1313 (citation omitted).

Plaintiffs' principal argument is that the dog-deer hunting ban is arbitrary and capricious because the Forest Service permits dog-deer hunting in other similarly situated Region 8 National Forests. Specifically, they note that dog-deer hunting is allowed in National Forests in Mississippi and Arkansas. While they acknowledge that dog-deer hunting is not allowed in seven of the fifteen Region 8 National Forests, they argue that these bans are the result of state laws against dog-deer hunting. Plaintiffs emphasize that KNF is the only Region 8 National Forest in which dog-deer hunting is permitted by the state government but banned by the Forest Service, and they conclude that the Forest Service has failed to provide a reasoned explanation for this disparate treatment of similarly situated entities.

Plaintiffs do not cite any authority stating that the Forest Service is required to compare the management plans of every National Forest in the same region when creating an EA, or that it must explicitly justify any differences between such management plans every time a new amendment is proposed.[67] The case they repeatedly cite in support of their argument, Lilliputian Systems Inc., is easily distinguishable from the present matter. In Lilliputian Systems Inc., the D.C. Circuit took issue with the disparate treatment of extremely similar products, flammable gas cartridges and medicinal and toilet articles containing flammable gas, all of which contain the same class of hazardous materials, in the narrow context of airline safety. While KNF and the National Forests in Mississippi and Arkansas may reside in the same bureaucratic subcategory, they each possess unique habitats and wildlife, geographical characteristics, access and roadways, neighboring lands, and available recreational activities. They cannot be so effortlessly determined to be similarly situated as flammable gas cartridges and medicinal and toilet articles containing flammable gas may be in the context of airline safety.

The Forest Service carefully analyzed KNF in evaluating the propriety of the ban. Among other factors, the Forest Service considered features unique to KNF such as documented conflicts from KNF's neighboring landowners dating back to the 1990s, the road system in KNF and how dog-hunting related to KNF's access roads and traffic levels, and the make-up of communities surrounding KNF and the impact the prohibition would have on those economies and cultures.

---

[67] A new National Forest System land management planning rule ("2012 Rule") was issued on April 9, 2012. See National Forest System Land Management Planning, 77 FR 21162-01. The 2012 Rule took effect after the publication of the 2012 EA, which cites the previous rule, and the 2012 Decision Notice and FONSI, but before the 2012 Appeal Decision, the Errata, and the Reviewing Officer's acceptance of the Errata. The Court declines to determine the applicability of the 2012 Rule to these proceedings because it is unnecessary to do so. Nonetheless, it is interesting to note that one court explained that "while the 2012 Planning Rule outlines the same overarching development process and management goals for every forest, each forest plan developed under the Rule will be unique." Fed. Forest Res. Coal. v. Vilsack, 100 F. Supp. 3d 21, 30 (D.D.C. 2015).

Plaintiffs do not explain how exactly the National Forests in Mississippi and Arkansas share these characteristics to such a degree that they would be considered similarly situated, other than mentioning in passing that both KNF and the National Forest in Mississippi are segmented.

Plaintiffs further argue that the Forest Service failed to explain why dog-deer hunting should be treated differently than other types of hunting with dogs (ex. squirrel, game bird, raccoon, and rabbit). The Forest Service responds that it did distinguish dog-deer hunting from other types of dog hunting in the 2012 EA, which states that: "Dog hunting for other game species, which typically does not require large contiguous blocks of land, and involves only one or two dogs or hunters, was not considered to be a significant issue and was therefore not addressed."[68] It further explains that the ban was pursued as a result of complaints about dog-deer hunters,[69] not other types of hunting with dogs. The Forest Service has sufficiently explained why dog-deer hunting was treated differently than other types of hunting with dogs.

Thus, the Court finds that the Forest Service appropriately distinguished dog-deer hunting in KNF from other types of dog hunting and dog-deer hunting in other National Forests.

c. *The Forest Service Adequately Considered the Social and Cultural Impact of the Dog-Deer Hunting Ban*

Plaintiffs assert that the 2012 Decision Notice was arbitrary and capricious because it did not consider an important aspect of the problem, namely the social and cultural impact of the ban. The 2012 Decision Notice provides that:

> The selected alternative will not preserve the tradition and culture of dog-deer hunting. It will however position the agency to respond to the greater demands of the non-hunting public while preserving still-hunting opportunities, and the opportunity to hunt other types of game with dogs. Due to still hunters requiring less land area, this alternative may allow the KNF to absorb an additional influx of

---

[68] 2012 EA (G001-EA-2012-02-13.pdf) at 12.
[69] See 2012 EA, App'x H (G002-EA-Appendix-2012-02-13.pdf).

still hunters without adding additional conflict or displacement to the non-hunting public.[70]

The 2012 EA, which formed the basis for the 2012 Decision Notice, includes an in-depth analysis of the social and cultural impacts of the ban.[71]

The Forest Service is not tasked with evaluating the social and cultural impact of the ban *solely* as it affects dog-deer hunters, but as it affects all KNF users. In the 2012 EA, the Forest Service explained that only between 660 (0.0146%) and 983 (0.0217%) of Louisianans hunted deer with dogs on KNF during the 2009-2010 season.[72] Far from not considering the social and cultural impact of the ban, the Forest Service concluded that the vast majority of people who utilize KNF would benefit socially and culturally from the ban. Thus, the Forest Service appropriately considered the social and cultural impact of the dog-deer hunting ban.

Accordingly, the Court finds that the Forest Service's decision to implement the dog-deer hunting ban was neither arbitrary nor capricious.

3. The Forest Service's 2012 FONSI is not Arbitrary and Capricious, Contrary to Law, or Otherwise not in Accordance with Law

Finally, Plaintiffs challenge the 2012 FONSI. "The threshold determination of whether the effect of the proposed action is sufficiently 'significant' to necessitate the production of an [environmental impact statement ('EIS')] is made by the preparation of an Environmental Assessment ('EA')." Spiller v. White, 352 F.3d 235, 237 (5th Cir. 2003) (citing Sabine River Auth. v. U.S. Dep't of Interior, 951 F.2d 669, 677 (5th Cir. 1992)). "The EA is 'a rough-cut, low-budget environmental impact statement designed to show whether a full-fledged environmental impact statement—which is very costly and time-consuming to prepare and has been the kiss of death to

---

[70] 2012 Decision Notice (H001-DD2-DN-FONSI-2012-02-29) at 5.
[71] 2012 EA (G001-EA-2012-02-13.pdf) at 53-59.
[72] Id. at 54.

22

many a federal project—is necessary.'" Sabine River Auth., 951 F.2d at 677 (citation omitted).

"The EA will come to one of two findings: either that the project requires the preparation of an

EIS to detail its environmental impact, or that the project will have no significant impact (a

"FONSI") necessitating no further study of the environmental consequences which would

ordinarily be explored through an EIS." Id. (citation omitted).

Whether an agency action has a significant effect under NEPA requires consideration of

both context and intensity. 40 C.F.R. § 1508.27. Context "means that the significance of an action

must be analyzed in several contexts such as society as a whole (human, national), the affected

region, the affected interests, and the locality." Id. § 1508.27(a). Intensity refers to the severity of

the impact, and the regulations direct agency officials to consider ten factors in evaluating the level

of intensity. Id. § 1508.27(b). The factors include "[t]he degree to which the proposed action

affects public health or safety" and "[t]he degree to which the effects on the quality of the human

environment are likely to be highly controversial." Id. § 1508.27(b)(2), (4). Title 40 C.F.R.

§ 1508.14 provides that:

> Human environment shall be interpreted comprehensively to include the natural
> and physical environment and the relationship of people with that environment.
> (See the definition of "effects" (§ 1508.8).) **This means that economic or social
> effects are not intended by themselves to require preparation of an
> environmental impact statement.** (emphasis added).

"Because NEPA dictates no particular substantive result, an agency decision not to conduct

an EIS based on a FONSI is reviewable only on procedural grounds." Spiller, 352 F.3d at 240.

Plaintiffs face a high bar to success as the Supreme Court has held that in reviewing agency

decisions involving alleged NEPA violations, the agency decision must be upheld unless it is

arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. Id. (citing

Marsh v. Oregon Natural Res. Council, 490 U.S. 360, 375 n.21 (1989)). "Under this 'highly

deferential' standard, a reviewing court has the 'least latitude in finding grounds for reversal' of an agency decision and 'may not substitute its judgment for that of the agency.'" Id. (quoting Sabine River Auth., 951 F.2d at 678).

Plaintiffs argue that the "Forest Service's discussion of the ten factors is reduced to a series of conclusory statements [that] do not survive even the most cursory scrutiny."[73] This argument is entirely meritless. All the "conclusory statements" in the 2012 FONSI that address the ten factors in § 1508.27 cite the portions of the 2012 EA on which they are based.

Next, Plaintiffs present the following catch-22 in regard to the public health and safety factor: "if the Forest Service's conclusions regarding the impact of Dog-Deer Hunting on the forest are to be believed, then the elimination of Dog-Deer Hunting will necessarily have a significant impact on the human environment and a proposal to enact such a change requires the preparation of an EIS."[74] Under Plaintiffs' theory, a dog-deer hunting ban can only be valid if there is some non-arbitrary, i.e. significant, basis for it. Thus, they reason, if the Forest Service finds that a ban is justified, it necessarily follows that the ban will have a significant environmental impact. Clearly, Congress did not intend for an EA finding an issue significant enough to justify agency action to automatically mandate the issuance of an EIS or it would not have passed the provisions allowing a FONSI. There is no inherent contradiction in the Forest Service finding that dog-deer hunting causes issues sufficiently significant to merit a ban while also finding that the *overall* environmental impact of that ban is not significant enough to require the creation of an EIS.

Plaintiffs then argue that in addressing the human environment factor the Forest Service did not afford appropriate weight to the roughly thousand comments insisting that the ban would

---

[73] Mot. for Summ. J. (Doc. 27-1) at 26.
[74] Mem. in Opp'n to the Forest Service's Mot. for Summ. J. and Reply in Supp. of Pls.' Mot. for Summ. J. (Doc. 35) at 16.

have a significant impact on the human environment. Those comments, a clear majority of which were form letters, are merely one means of evaluating "the natural and physical environment and the relationship of people with that environment." 40 C.F.R. § 1508.14. Moreover, more comments are typically received from those who have concerns about a decision than those who have no issues with a decision. See Louisiana Sportsmen Alliance, LLC v. Vilsack, 984 F. Supp. 2d at 609. Finally, the regulations specifically provide that "economic or social effects are not intended by themselves to require preparation of an environmental impact statement." Id. Plaintiffs have not overcome the high bar of showing that the 2012 FONSI was arbitrary and capricious, contrary to law, or otherwise not in accordance with law.

## III.    CONCLUSION

After careful consideration of the administrative record and the parties' arguments, and based on the foregoing, the Court **AFFIRMS** the Forest Service's present decision to prohibit the use of dogs to hunt deer in KNF. However, nothing in this ruling shall prevent review by the Forest Service of the issue as may be appropriate in future circumstances. Accordingly,

**IT WILL BE ORDERED** that Plaintiffs' Motion for Summary Judgment (Doc. 27) will be **DENIED**.

**IT WILL FURTHER BE ORDERED** that the Forest Service's Cross Motion for Summary Judgment (Doc. 31) will be **GRANTED**.

**IT WILL FURTHER BE ORDERED** that Plaintiffs' claims will be **DISMISSED WITH PREJUDICE**.

A separate judgment memorializing this ruling will follow.

**SIGNED** on this _21st_ day of December 2018, at Alexandria, Louisiana.

JUDGE DEE D. DRELL
UNITED STATES DISTRICT COURT